# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **TEAMSTERS LOCAL UNION NO. 957** | : | |
| **2719 ARMSTRONG LN.** | : | |
| **DAYTON, OH 45414, affiliated with the** | : | **CASE NO.** |
| **International Brotherhood of Teamsters,** | : | |
| | : | **Judge** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | **COMPLAINT TO COMPEL** |
| **PENSKE TRUCK LEASING CO., L.P.,** | : | **ARBITRATION** |
| **15041 COMMERCE DR. SOUTH** | : | |
| **SUITE 400** | : | |
| **DEARBORN, MI 48120** | : | |
| | : | |
| **Defendant.** | : | |

Now comes Plaintiff Teamsters Local Union No. 957, affiliated with the International Brotherhood of Teamsters ("Local 957" or "the Union") by and through its undersigned counsel, and in support of an action against Defendant Penske Truck Leasing Co., L.P., ("Penske" or "the Company") states the following:

## INTRODUCTION

1. This is an action by Local 957 seeking to enforce a provision in the Parties' collective bargaining agreement ("the contract") requiring arbitration of alleged violation of the contract.

## JURISDICTION AND VENUE

2. This claim arises under the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 141 et seq., (hereinafter "the Act").

3.      Jurisdiction over suits for violation of a collective bargaining agreement between an employer and a labor organization is conferred on this Court by Section 301 of the Act, 29 U.S.C. § 185. This Court has jurisdiction over this suit because Local 957 maintains its principal office within the Court's territorial jurisdiction, the Company systematically offers services and products within the Court's territorial jurisdiction, and the actions giving rise to this dispute occurred within the Court's territorial jurisdiction.

4.      Venue is appropriate in this judicial district pursuant to 29 U.S.C. § 185(a) in that this Court has jurisdiction of the Parties.

## PARTIES

5.      Plaintiff, Local 957, is a labor organization within the meaning of the Act, 29 U.S.C. § 152(5), and is the duly recognized and exclusive bargaining representative for certain employees of Defendant, Penske.

6.      Defendant, Penske, is a corporation authorized to do business in the State of Ohio and is engaged in an industry affecting commerce as defined in Sections 2(6) and (7) of the Act, 29 U.S.C. § 152(6) and (7).

## STATEMENT OF CLAIM

7.      On or about March 14, 2019, Local 957 and Penske entered into a collective bargaining agreement ("the contract") effective March 1, 2019 through February 28, 2023. A copy of the contract is attached hereto and made a part hereof as **Exhibit A**. The provisions of the contract continue to govern the terms and conditions of employment of the covered employees at all times material herein.

8.      Article I – Recognition, of the contract states that the contract "shall also apply to future Penske operations commenced in the greater Dayton, Ohio area, where Penske is contracted to

2

provide truck maintenance and leasing services, however, such recognition is limited to Penske's discretion to exclude any new facility or operation based upon customer or operational requirements."

9.    The contract incorporates a Letter of Understanding, executed between the parties and dated March 5, 2012, which states, in part, "[s]pecific to any new Penske facility opened to service an account that was assigned to Penske at Dayton, Ohio, such new facility would remain on the Dayton master Seniority List for purposes of layoff, recall and job openings…"

10.    Article VI – Grievance Procedure and Arbitration, of the contract provides a method for the presentation and resolution of "an alleged violation of a specific provision of [the contract]…" via arbitration.

11.    In March, 2021, Mark Morrell, a Business Representative employed by Local 957, determined that the Company opened a new truck maintenance and leasing facility in Piqua, Ohio.

12.    Piqua, Ohio is located is the Dayton, Ohio Metropolitan Statistical Area, as defined by the United States Census Bureau.

13.    Morrell demanded to Penske that the Company recognize that the contract applies to its Piqua, Ohio facility, in accordance with the provisions of Article I and the Letter of Understanding contained within the contract.

14.    Penske refused to apply the contract to its Piqua, Ohio facility and a grievance was filed by the Union on or about May 6, 2021, alleging that Penske had violated the contract between when it failed to apply the contract to work performed at the newly-opened Penske facility in Piqua, Ohio. A copy of said grievance is attached hereto and made a part hereof as **Exhibit B**.

15.    Penske denied the grievance on or about May 10, 2021, while acknowledging, via letter, that the grievance "is a matter of contract interpretation." A copy of said letter is attached hereto and made part hereof as **Exhibit C**.

16.    The grievance referenced in Paragraph 12 of this Complaint was processed through the contractual grievance procedure with a demand for arbitration submitted by Local 957 to Penske on June 15, 2021.  A copy of the email demanding arbitration dated June 15, 2021 is attached hereto and made a part hereof as **Exhibit D**.

17.     On or about June 15, 2021, Local 957 sent for a Request for a Panel of Arbitrators to the Federal Mediation and Conciliation Service (FMCS) in accordance with the procedures contained in Article VI of the contract. A copy of the Union's Request for a Panel of Arbitrators from the FMCS is attached hereto and made a part hereof as **Exhibit E**.

18.     On or about July 27, 2021, Penske exercised its right, in accordance with the procedures contained in the contract, to select a second, different panel of arbitrators from FMCS from which an arbitrator was to be selected. A copy of Penske's Request for a Panel of Arbitrators from the FMCS is attached hereto and made a part hereof as **Exhibit F**.

19.     Notwithstanding its obligation to process said grievance to and through the arbitration procedures, on or about August 12, 2021 Penske notified the Union, via the parties' respective counsel, that it would not process the grievance to arbitration.

20.     Instead of participating in the contractually-agreed-upon arbitration procedure, on or about August 12, 2021, Penske filed a Unit Clarification Petition with Region Nine of the National Labor Relations Board ("NLRB") seeking to exclude the two technicians employed at the Company's Piqua, Ohio facility from the unit of employees, represented by the Union, at the Company's Dayton, Ohio facility. A copy of the Unit Clarification Petition is attached hereto and made a part hereof as **Exhibit G**.

21.     On September 2, 2021, Region 9 of the NLRB conducted a hearing on Penske's Unit Clarification Petition. At the hearing, the Union argued, in part, that because the dispute was contractual in nature, the Regional Director should defer resolution of the dispute to an arbitrator, pursuant to the parties' contract.

22.     On October 1, 2021, the Regional Director issued a Decision and Order granting Penske's Unit Clarification Petition, thus excluding the Company's two Piqua, Ohio employees from the bargaining unit of employees represented by the Union at the Company's Dayton, Ohio facility.

23.     The Regional Director acknowledged in his Decision and Order that "there may be a contractual dispute over whether the Employer violated the Agreement by failing to apply the parties' collective-bargaining agreement to Piqua or follow the terms of Letter of Understanding…" however,

the Regional Director concluded that the issue of whether the Piqua, Ohio employees should added to the Dayton, Ohio bargaining unit involved the application of statutory policy and thus should be decided by the NRLB.

24.     On or about October 18, 2021, the Union filed a Request for Review of the Regional Director's Decision and Order with the NLRB, arguing the Regional Director erred when he failed to defer Penske's Unit Clarification Petition to the arbitration procedure contained in the contract.

25.     On July 12, 2022, the NLRB denied the Union's Request for Review, holding the precise dispute – as framed by Penske's Unit Clarification Petition – was whether, under the National Labor Relations Act, the Piqua, Ohio employees could be accreted to the Company's Dayton, Ohio unit.

26.     While ruling against the Union, the NRLB's decision acknowledged "the unit status of the [Piqua] employees might ultimately be resolved in some other forum, on some other legal basis," while also agreeing with the Regional Director's observation that "there may be a contractual dispute over whether the Employer violated the Agreement by failing to apply the parties' collective bargaining agreement to Piqua…"

27.     The NLRB concluded its decision by stating that "[n]othing" in the decision "prevents the Union from seeking to add the employees to the unit through some other lawful mechanism established by the [National Labor Relations] Act or agreement."

28.     Following the NLRB decision, and upon the Union's demand, Penske has refused to participate in the contractually mandated arbitration procedure.

29.     Penske's conduct in refusing to comply with the contractually mandated arbitration procedures is willful, wanton, bad faith and in complete disregard of its obligations under the collective bargaining agreement, thereby entitling the Union to punitive damages and attorney's fees.

**WHEREFORE**, Local 957 hereby prays that this Court provide the following relief:

(A) An order from this Court requiring Defendant, Penske, to immediately comply with contractually mandated arbitration procedures and to proceed to arbitration on the aforementioned grievance;

(B) An order from this Court requiring Defendant, Penske, to pay to Plaintiff, Local 957, punitive damages and attorney fees in an amount the Court deems just and proper for Defendant's willful, wanton, and bad faith refusal to comply with the terms and conditions of the collective bargaining agreement between the parties;

(C) An order from this Court requiring Defendant Penske, to pay all costs of this litigation, including Court costs and reasonable attorney fees, for Defendant's bad faith refusal to comply with the terms of the collective bargaining agreement; and

(D) An order from this Court granting such other relief as the Court deems just and proper.

Respectfully submitted,

**DOLL, JANSEN & FORD**

    /s/John R. Sauter
John R. Sauter - 0087691
111 West First St., Suite 1100
Dayton, Ohio  45402-1156
(937) 461-5310
(937) 461-7219 (Fax)
jsauter@djflawfirm.com

ATTORNEY FOR PLAINTIFF,
TEAMSTERS LOCAL UNION NO. 957



# LABOR AGREEMENT

### between

## PENSKE TRUCK LEASING CO., L.P.



### and

## INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 957
### Dayton, Ohio



**Dated: From March 1, 2019 through February 28, 2023**

# TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I. | RECOGNITION | 3 |
| II. | MANAGEMENT RIGHTS | 4 |
| III. | SENIORITY, LAYOFF & RECALL | 4 |
| IV. | LEAVE OF ABSENCE | 7 |
| V. | SHOP STEWARDS | 8 |
| VI. | GRIEVANCES & ARBITRATION | 9 |
| VII. | WORK-WEEK | 10 |
| VIII. | PART-TIME EMPLOYEES | 11 |
| IX. | CHECK-OFF OF UNION MEMBERSHIP DUES | 12 |
| X. | D.R.I.V.E. | 13 |
| XI. | WAGES | 13 |
| XII. | NO STRIKE -- NO LOCKOUT | 14 |
| XIII. | HOLIDAY PAY | 15 |
| XIV. | GARMENTS | 17 |
| XV. | VACATIONS | 17 |
| XVI. | CONDUCT OF EMPLOYEES | 18 |
| XVII. | HEALTH & WELFARE | 19 |
| XVIII. | PENSION FUNDS | 19 |
| XIX. | DEATH IN FAMILY | 20 |
| XX. | JURY DUTY | 21 |
| XXI. | PERSONAL DAYS | 21 |
| XXII. | NO DISCRIMINATION | 22 |
| XXIII. | TOOL INSURANCE | 22 |
| XXIV. | SAFETY | 23 |
| XXV. | TRANSFER OF COMPANY TITLE OR INTERES | 23 |
| XXVI. | MOONLIGHTING | 24 |
| XXVII. | MISCELLANEOUS | 24 |
| XXVIII. | SAVINGS & LEGALITY CLAUSE | 24 |

| Letter of Agreement | 27 |
|---|---|
| Letter of Understanding | 29 |

# LABOR AGREEMENT

This Agreement is effective March 1, 2019, between PENSKE TRUCK LEASING CO., L.P. in Dayton, Ohio, hereinafter referred to as the "Employer", and Local Union 957 affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, Dayton, Ohio, hereinafter referred to as the "Union."

## ARTICLE I
## RECOGNITION

SECTION 1. For the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment, subject to and in accordance with the provisions of the Labor-Management Relations Act of 1947, the Employer recognizes the Union as the exclusive representative of employees as indicated in the National Labor Relations Board certification Case No. 9-RC-4699.

This Agreement shall also apply to future Penske operations commenced in the greater Dayton, Ohio area, where Penske is contracted to provide truck maintenance and leasing services, however, such recognition is limited to Penske's discretion to exclude any new facility or operation based on customer or operational requirements. This recognition shall in no way contravene the rights promulgated under the National Labor Relations Act, as Amended.

SECTION 2. In accordance with the provisions of Section 8 (a) of the Labor Management Relations Act of 1947, all employees covered by this Agreement shall within thirty-one (31) days after the execution hereof or thirty-one (31) days after their employment during the term of this Agreement to become members of the Union and retain such membership during the period of this Agreement or pay such fees equal to but not greater than the monthly dues commensurate with Union representation services. The Employer agrees to notify the Union in writing within forty-eight 48 hours of the employment of new employees.

The Union agrees to indemnify and hold the Employer harmless against any and all claims, demands, suits, or other forms of liability that may arise out of, or by reason of action taken or not taken off by the Employer in complying with the provisions of this article.

SECTION 3. It is mutually agreed that the following employees not be in the bargaining unit: Shop Forepersons, Supervisor and General Office Employees, Rental Representatives, Secretaries, and all employees with the authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees or effectively recommend such action. Supervisors can perform

bargaining unit work in emergencies, for training purposes or where such work is insignificant in nature only.

SECTION 4. The purpose of this Agreement is to provide orderly collective bargaining relations between the Employer and the Union, to secure a prompt and equitable disposition of grievances, and to establish fair wages, hours, and working conditions for the employees covered by this Agreement.

## ARTICLE II
## MANAGEMENT RIGHTS

SECTION 1. The rights of the Employer shall include, but shall not be limited to, his/her rights to hire, promote, layoff, recall, discharge, or discipline employees for cause. It is the sole responsibility of the Employer to maintain discipline and efficiency of employees, except that Union members shall not be discriminated against as such. In addition, the location of stations, the schedules, methods, processes, and means of operations are solely and exclusively the responsibility of the Employer, except as set forth in writing in this Agreement.

## ARTICLE III
## SENIORITY, LAYOFF & RECALL

SECTION 1. Employees shall be regarded as probationary employees until their names have been placed on the seniority list. There shall be no responsibility for the re-employment of probationary employees if they are laid off or discharged during this period.

SECTION 2. Employees covered in the classifications under the jurisdiction of this Agreement shall be considered on probation until acquiring seniority after successfully completing ninety (90) calendar days of continuous employment. During the probation period employment shall be at-will.

> (a) The Employer shall within thirty (30) calendar days of the effective date of this Agreement, and every six (6) months thereafter, post in a conspicuous place a list of all employees in the Teamsters Local 957 bargaining unit covered under this Agreement showing their most recent date of hire into this bargaining unit. The employees must notify the Branch Service Manager of any errors within thirty (30) calendar days of posting the seniority list. If there are no reported errors within thirty (30) days, the posted list shall stand as the seniority list. If there are any reported errors, the corrected or amended list shall stand as the seniority list.

SECTION 3. In the event of a reduction in force, employees will be laid off based on Company seniority in the Teamsters Local 957 bargaining unit. Senior employees can displace employees in lower rated job classifications provided they possess the fitness and ability to perform the work.

SECTION 4. In increasing the working force, employees will be called back in the reverse order in which they were laid off.

SECTION 5. The Employer will observe shift preference according to classification seniority, and so far as practicable will observe seniority in the assignment of vacation periods. Exercise of shift preference and the assignment of vacation periods by seniority shall not be permitted to interfere with the efficiency of operations except that where reasonably possible at least one (1) employee from each classification will be allowed off at the same time.

SECTION 6. In the advancement of employees to higher paid jobs, the employee with the longest seniority will be given preference so long as they possess the ability and fitness to perform the work.

SECTION 7. An employee who has acquired seniority in an occupation covered by this Agreement and who is transferred to an occupation not covered by this Agreement shall accumulate seniority up to thirty (30) days of the transfer. Only in the event an employee is subsequently transferred back to an occupation covered by this Agreement within thirty (30) days shall the employee be credited with full seniority in his/her original occupation, and will continue to accumulate seniority in the bargaining unit. Employees shall be afforded this opportunity one (1) time only.

SECTION 8. Loss of Seniority: Seniority shall be broken for any one of the following reasons:

(a) If the employee quits;

(b) If the employee is discharged for just cause and such discharge is not reversed by way of the grievance procedure.

(c) If the employee is absent for three (3) consecutive working days without properly notifying his/her immediate Supervisor on or before the end of the third workday

(d) If the employee fails to contact the Employer within three (3) working days after notice to report for work by certified mail has been sent by the Employer to the employee's last known address, and or does not return to work within seven (7) days of notification being sent

(e)   If the employee is laid off for a continuous period of two (2) years; any full time Employees hired after the ratification of this Agreement ("New Hires") the loss of seniority time is equal to the amount of time actively employed up to two (2) years.

(f)   Retirement as follows:

    (1)   An employee who retires shall cease to be an employee and shall have his/her name removed from the seniority list.

    (2)   An employee who has been retired on a total and permanent disability pension and who thereby has broken his/her seniority in accordance with sub-section (1) above, but who recovers and is subsequently re-employed, shall have his/her seniority reinstated as though he has been continued on a sick leave of absence during the period of his/her disability retirement.

    (3)   If an employee retired for reasons other than total and permanent disability, who has lost seniority in accordance with sub-section (1) above, is rehired, such employee will have the status of a new employee and without seniority, and shall not acquire or accumulate any seniority thereafter, except for the purpose of applying the provisions governing holiday pay and vacation pay.

(g)   If employee gainfully accepts employment with another Employer while on approved leave of absence.

**SECTION 9.** In the case of shortage of work to be performed, where it becomes necessary to reduce payroll costs, it is agreed that the Employer will give the employee(s) affected five (5) working days' notice before a reduction is made. The provisions of this section shall not apply where no work is available due to an Act of God or any other emergency beyond the control of the Employer.

**SECTION 10.** To protect his/her seniority, it is the employee's responsibility to keep the Employer informed of his/her proper home address. At the time of layoff each employee will be given an opportunity to submit, in writing to the Employer, his or her correct address, of which the employee shall receive a copy.

**SECTION 11.** In the event Penske's volume of business contracts to the extent that an existing Tech I (i.e., a Tech I who was hired prior to ratification of this Agreement) must bump down to a lower job category, such individual will not suffer a reduction in their pay rate. In the event any Tech I, II or III who was hired after ratification of this Agreement elects to bump down to a lower job category, then such individual will be compensated at the current rate for that classification according to the provisions of Article XI of this Agreement.

SECTION 12. The Tech I with the most seniority will be the lead person on Saturday provided that in Penske's opinion such person possesses the ability and temperament necessary to successfully discharge the duties of a lead. Penske will designate the lead person.

# ARTICLE IV
## LEAVE OF ABSENCE

SECTION 1. A leave of absence may be granted for personal reasons for a period not to exceed thirty (30) days upon written application of the employee to and written approval from his/her District Manager. Such leaves of absence may be renewed by the approval of the Company for an additional thirty (30) day period. Seniority will accumulate during such leave of absence.

SECTION 2. In the event of off the job illness, injury, or pregnancy which prevents the performance of regular duties, an employee with seniority status will be granted a leave of absence after medical evidence satisfactory to the Employer is presented for a period not to exceed nine (9) months. If the illness, injury or pregnancy continues beyond nine (9) months, such leave will be extended for an additional period up to six (6) months provided medical evidence satisfactory to the Employer is presented. The employee shall keep his/her immediate supervisor informed monthly in writing of the approximate time when he shall be able to resume his/her regular duties. The employee's return to work shall be subject to the approval of the attending physician and/or the Employer's designated physician. Any disputes between the Company and the employee's personal physician shall be settled by a third physician, mutually agreed to between the employee and the company. All expenses incurred shall be split evenly between the parties. Seniority shall accumulate during the leave.

SECTION 3. Probationary employees without seniority shall not receive credit for time off sick during the probationary period toward the days of employment required to acquire seniority, and in no case shall a temporary employee's name be placed on the seniority list while away from work on sick leave.

SECTION 4. All of the above leaves of absence, including sick leaves, are granted subject to the following conditions:

(a) The return of any employee to work before the expiration of his/her leave of absence is at the option of the Employer.

(b) Any employee who fails to report for work within three (3) working days after date of expiration of the leave shall be considered as having voluntarily quit unless properly notifying his/her immediate Supervisor on or before the end of the third workday.

(c) If upon the expiration of a leave of absence there is no work available for the employee in line with his/her seniority, or if the employee would otherwise have been subject to layoff according to seniority during the period of leave, the period which breaks seniority shall start from the date of layoff would have occurred according to seniority.

(d) Consistent with current practice, and in accordance with applicable State and Federal law, any leave of absence granted shall run concurrently with all other such leave, including for example but not limited to, vacation, personal time, FMLA, STD, and or LTD.

SECTION 5. Leaves of Absence for Military Service:

(a) Any employee who enters into active service in the Armed Forces of the United States will be given a leave of absence for and will accumulate seniority during such period of service, and upon termination of such service shall be offered re-employment in his/her previous position or a position of like seniority, status and pay, unless the circumstances have so changed as to make it impossible or unreasonable to do so, in which event he will be offered such employment as may be available which is capable of doing at the current rate of such work, provided he has not been dishonorably discharged, is physically and mentally able to do the work and reports for work within ninety (90) days of the date of such discharge.

## ARTICLE V
## SHOP STEWARDS

SECTION 1. The Employer recognizes the right of the Union to designate Shop Stewards and alternates who must be employees of the Employer. The authority of the Shop Stewards and alternates so designated by the Union shall be limited to and shall not exceed the following duties and activities:

(a) The investigation and presentation of grievances in accordance with the provisions of the collective bargaining agreement.

(b) The transmission of such messages and information which shall originate with and are authorized by the Local Union or its officers, provided such messages and information are of a routine nature and provided such messages and information do not involve work stoppages, slowdowns, refusal to handle goods or any other interference with the Employer's business and provided it does not cause any interruption of work in the unit.

(c) No function of the Shop Steward shall be carried out on Company time except the processing of grievances.

<u>SECTION 2.</u> Shop Stewards and alternates have no authority to take strike action or any other action interrupting the Employer's business, except as authorized by official action of the Union.

<u>SECTION 3.</u> The Employer recognizes these limitations upon the authority of the Shop Stewards and their alternates and shall not hold the Union liable for any unauthorized acts. The Employer, in so recognizing such limitations, shall have the authority to impose proper discipline, including discharge, in the event the Shop Steward has taken unauthorized strike action, slowdown, or work stoppage in violation of this Agreement.

## ARTICLE VI
## GRIEVANCE PROCEDURE AND ARBITRATION

<u>SECTION 1.</u> A grievance is a protest by an employee against the Employer because of an alleged violation of a specific provision of this Agreement. Failure to follow the procedures and steps outlined or the failure to follow the time limits shall be an absolute bar to the further processing of grievances or the arbitration thereof. Every effort shall be made to settle any grievance as expediently as possible in accordance with the following procedure.

<u>SECTION 2.</u> Consistent with current practice, the following Steps 1 – 4, are the parties' remedy for protesting alleged violations of this Agreement.

<u>STEP 1.</u> The grievance shall first be taken up with the immediate Supervisor within five (5) work-days of knowledge of the alleged contract violation.

<u>STEP 2.</u> The aggrieved employee must reduce the complaint to writing and submit it to the District Manager within five (5) work-days of the Step 1 Grievance Meeting. The District Manager will give a written answer within five (5) work-days from the date the grievance was presented to the District Manager in writing.

<u>STEP 3.</u> If the Union desires to process the grievance further, it shall be taken up by the Business Representative of the Union with the Area Vice President or his/her designee within five (5) workdays from the date the District Manager in Step 2 gives his/her written answer. The Area Vice President or his/her designee will give his/her written answer within five (5) work-days after receipt of the Second Step response from the Union.

STEP 4. Through mutual agreement, the parties may agree to submit any dispute hereunder to the Private Carriage Committee for decision. Absent such agreement, if the Union desires to arbitrate the grievance after having been fully processed according to the provisions of this contract, it shall be submitted to arbitration as follows:

    (a) Within ten (10) calendar days after receipt of the Employer's written answer in the Third Step, the Union shall notify the Employer in writing of its intention to submit the grievance to arbitration.

    (b) The parties will attempt to agree upon an arbitrator, but if they fail to agree, the parties moving party will request the Federal Mediation and Conciliation Service or any other mutually agreeable party to submit a list of seven (7) arbitrators from which each party will alternately strike names. Prior to selecting an arbitrator, either party may make one (1) request an alternate list arbitrator at their own expense. The party requesting the list of arbitrators shall strike first, the remaining name will be the arbitrator.

    (c) The Union or the Company shall have the authority to withdraw or settle any grievance prior to the decision or award of the arbitrator. Any such settlements shall be final, binding, and limited to resolving only the contested grievance, unless otherwise mutually agreed in writing.

SECTION 3. The arbitrator shall not have the power to add to or subtract from or modify any of the terms of this Agreement or any agreements supplemented hereto. The decision of the arbitrator shall be final and binding on all parties.

SECTION 4. Each party shall bear its own expense with respect to the preparation and presentation of the matter to the arbitrator, but the cost or expense of the arbitrator and the conference room shall be borne by the non-prevailing party in the arbitration.

## ARTICLE VII
## WORK-WEEK

SECTION 1. It is understood that because of the unusual nature of the Employer's business, the operation shall be on a seven (7) days per week basis. It is further understood that the Employer shall have the right to establish various shifts, whether they be day, night or Sunday in order to cover all phases of its business. The working schedule shall consist of five (5) consecutive workdays of

eight (8) hours each day or four (4) workdays consisting of ten (10) hours each workday for all employees covered by this Agreement unless otherwise provided by mutual agreement. Any changes in a shift schedule shall require at least forty-eight (48) hours' notice to the affected employee(s) before implementation of the change, except in cases of bona fide emergency. The Employer may, at its discretion, adopt alternative schedules in order to meet the needs of business, with advance notice to the Union. The Employer shall in all cases provide the employee the opportunity to work the scheduled shift bid.

SECTION 2. Employees working a 5/8 schedule will be paid time and one-half (1-1/2x) their applicable hourly rate for all hours worked in excess of forty (40) hours per week. Employees working a 4/10 or 3/12 schedule will be paid time and one-half (1-1/2x) their applicable hourly rate for all hours worked in excess of forty (40) hours per week. Two (2x) times the applicable hourly rate shall be paid to employees for all hours worked on a seventh (7th) consecutive day worked, provided that the previous six (6) days were actually worked and the employee did not bid into a 7th consecutive day when changing schedules.

SECTION 3. There will be no pyramiding of overtime. No overtime will be approved unless authorized prior by someone acting in a managerial capacity. When it becomes necessary to cover for absences on an overtime basis, such overtime will be made available to regular full time employees, by seniority by classification (ask from the top, push from the bottom), whenever possible. Call-ins and shift vacancies as a result of absenteeism, when covered, will be offered to the most senior qualified employee available in that classification. It is understood that for coverage on holidays it is the sole discretion of the Company as to what classification will be utilized.

SECTION 4. Employees reporting for work on any day in accordance with their schedule shall be given a minimum of four (4) hours per day (five (5) hours if on 4/10 schedule).

SECTION 5. Emergency Call in Pay: All employees when notified by the Employer to report back to work, shall be guaranteed a minimum of four (4) hours work or four (4) hours pay (five (5) hours if on 4/10 schedule).

SECTION 6. The employer will conduct a shift bid by classification annually, the first week in January, or at other times, as necessary, to coincide with operational needs.


# ARTICLE VIII
## PART-TIME EMPLOYEES

SECTION 1. The Employer, at its discretion, may employ persons in the

classifications covered by this Agreement on a part-time basis. Such employee will be covered by the terms of the Agreement with the following exceptions:

(a) A part-time employee will be paid holiday pay only if he would have been scheduled to work on the holiday and only in an amount for the hours he would have been scheduled to work. If the part-time employee works on the holiday he will be paid time and one-half (1 1/2x) at this regular rate for the hours worked in addition to the above if applicable.

(b) A part-time employee will accumulate vacation in accordance with the Agreement except that his/her vacation pay will be computed based on his/her regular straight time hourly rate for the average hours worked per week during the preceding thirteen (13) weeks.

(c) The Employer, at his/her discretion, will determine the hours to be worked by part-time employees. A part-time employee who refuses to work the scheduled hours is considered to have resigned. A part-time employee need not be assigned five consecutive work-days, however, hours worked in excess of forty (40) in any one (1) week will be paid at time and one-half (1 1/2x) the employee's regular straight time hourly rate of pay.

(d) Part-time employees in a classification will be laid off in order of seniority prior to regular full-time employees. Part-time employees will be recalled in order of seniority to work hours scheduled by the Employer. The Employer, at its discretion may employ regular full-time employees prior to recalling part-time employees.

(e) Part-time employees are included in the "Wages", "Recognition" and "Check-off" provisions of this Agreement, however, part-time employees who are not scheduled to work twenty (20) hours or more per week are excluded from all other terms and conditions of the Agreement which are not specifically amended by this Article.

(f) Part-time employees will not be used by Management to otherwise avoid its obligations under the Labor Agreement.

## ARTICLE IX
## CHECK-OFF OF UNION MEMBERSHIP DUES

SECTION 1. The Employer agrees that it will deduct all initiation fees, uniform assessments and monthly membership dues from the wages of employees who have made application for membership in the Union and who are covered by this

Agreement, provided that the Employer receives from each employee on whose account such deductions are made, an employee-signed assignment authorizing the Employer to make such deductions.

SECTION 2. The Union agrees to indemnify and hold the Employer harmless against any and all claims, demands,   suits, or other forms of liability that may arise out of, or by reason of action taken or not taken off by the Employer in complying with the provisions of this article.

## ARTICLE X
## D.R.I.V.E.

SECTION 1.  The Employer agrees to deduct each week from the wages of employees covered by this Agreement who executes an appropriate voluntary check-off authorization form to the Democratic, Republican, Independent Voter Education ("DRIVE") chapter the amount specified in the check-off authorization form signed and dated by the employee.  The deduction shall continue for the length of the Agreement and any renewals and/or extension thereof for each employee who signs the check-off authorization, unless the employee revokes the authorization in writing.

SECTION 2.  The Employee agrees that the amounts as deducted shall be remitted quarterly to the appropriate DRIVE chapter.

SECTION 3.  All deductions and transmittals shall be subject to and in strict accordance with all applicable laws.

SECTION 4.  The Union agrees to indemnify and hold the Employer harmless against any and all claims, demands, suits, or other forms of liability that may arise out of, or by reason of action taken or not taken off by the Employer in complying with the provisions of this Article.

## ARTICLE XI
## WAGES

SECTION 1.  Wages will be increased as follows during the term of this Agreement:

Wage Rates:

| Hourly Wages | 3/1/2019 | 3/1/2020 | 3/1/2021 | 3/1/2022 |
|---|---|---|---|---|
| Tech I | $27.60 | $28.55 | $29.50 | $30.45 |
| Tech II | $22.10 | $22.90 | $23.70 | $24.50 |
| Tech III | $18.90 | $19.50 | $20.10 | $20.70 |
| CSR I | $18.05 | $18.30 | $18.55 | $18.70 |

Lump Sum Payments for CSR I's:
CSR I associates on the active payroll at the time of payout shall receive the following lump sum payments: 1) Upon ratification of this labor agreement: $960; 2) March 1, 2020: $440.

SECTION 2. Shift Differential. An employee who works at least 60% of their assigned shift on a given workday, outside of the hours of 7:00 a.m. to 3:00 p.m., Monday through Friday, shall receive a shift differential incentive totaling one dollar ($1.00) per hour for all hours worked during such shift in addition to their applicable hourly wage rate as provided for in this Article.

All employees shall be compensated at the following minimum progression referenced below as percentages of their classification base rate until completing twelve (12) months of employment at which time they will be compensated at the full contract rate specified herein this Article above. The Employer may at its discretion accelerate the progression and will provide advance notice to the union upon such occurrence.

| | |
|---|---|
| New Hire | 90% of applicable rate |
| 6 Months | 95% of applicable rate |
| 12 Months | 100% of applicable rate |

SECTION 3. Any employee designated Leadman shall receive a lead differential in the amount of one ($1.00) dollar differential in addition to the rates prescribed above.

SECTION 4. The Company shall provide one set of rain gear and boots for each Customer Service attendant which are to be used during working hours only. Replacement will be made for reasonable wear and tear.

SECTION 5. Unforeseen Circumstances. It is agreed that the parties cannot foresee every conceivable wage rate question, which may arise in the future. It is agreed that the parties shall meet, discuss and agree on any wage rate question which is not covered by this Agreement as such questions may arise.


**ARTICLE XII**
**NO STRIKE -- NO LOCKOUT**

SECTION 1. The Union will not call or sanction any strike or concerted stoppage during the term of this Agreement.

SECTION 2. Should a strike or concerted stoppage of work by employees of the Employer occur during the term of this Agreement, the Union, within twenty-four

(24) hours after written notice from the Employer, shall be obliged to do the following things only:

    (a)   Advise the Employer and each employee in writing that the strike or stoppage has not been called or sanctioned by the Union.

    (b)   Post copies of the following notice on bulletin boards in the facility:

"We have been advised by Penske Truck Leasing Co., L.P. that a strike (stoppage) has occurred in the facility. Inasmuch as no such strike or stoppage has been called or sanctioned by the Union, if you are engaged in any such strike or stoppage, you are hereby instructed to return to work immediately.

Local No. 957
Affiliated with the International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen, and Helpers of America

BY:_____

THIS NOTICE IS POSTED IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT BETWEEN THE EMPLOYER AND THE UNION."

SECTION 3.  The obligation of the Union shall be limited to the performance of those acts indicated in Article XII and upon compliance by the Union with the above section, the Union, its officers, agents and members shall have no further liability for any damage suffered by the Employer because of any stoppage or strike.

SECTION 4.  The Employer during the first twenty-four (24) hour period of an unauthorized work stoppage or strike shall have the sole and complete right of discipline including discharge of employees, and such employees shall not be entitled to or have any recourse to any other provision of this Agreement.

SECTION 5.  During the life of this Agreement, the Employer will not lock out any or all of his/her employees.

## ARTICLE XIII
## HOLIDAY PAY

SECTION 1.  Hereafter, hourly rated full-time employees shall be paid for the following holidays providing they meet all the following eligibility rules, unless otherwise provided herein.

| | |
|---|---|
| New Years Day | Thanksgiving Day |
| Memorial Day | Christmas Eve Day |
| Independence Day | Christmas Day |
| Labor Day | Two Optional Holidays |

(a)  The employee has seniority as of the date of the holiday, and

(b)  The employee would otherwise have been scheduled to work on such day if it had not been observed as a holiday, and

(c)  The employee must have worked the last scheduled work day prior to and the next scheduled work day after such holiday within the employee's scheduled work-week, unless the absence is due to extenuating circumstances approved by the someone acting in a managerial capacity.

SECTION 2.  Employees with the necessary seniority who have been laid off in a reduction of force, or who have gone on sick leave during the work-week prior to or during the week in which the holiday falls shall receive pay for such holiday.

SECTION 3.  When a holiday falls on an employee's scheduled day off, eligible employees shall receive holiday pay provided they have worked the past preceding scheduled work-day within the week in which that holiday falls.  When the holiday falls on an employee's regularly scheduled day off, such employee shall not be forced to work in the event it is necessary to schedule an employee on the holidays.

SECTION 4.  When one of the above holidays falls within an eligible employee's approved vacation period, and he is absent from work during his/her regularly scheduled work-week because of such vacation, he shall receive one (1) extra days' vacation with pay.

SECTION 5.  When an eligible employee is on an approved leave of absence and returns to work following the holiday but during the week in which the holiday fell, he shall be eligible for pay for that holiday.

SECTION 6.  Employees working a 5/8 schedule eligible under these provisions shall receive eight (8) hours pay at their regular straight time hourly rate, exclusive of overtime premium for each such holiday.  Employees working a 4/10 schedule s eligible under these provisions shall receive ten (10) hours pay at their regular straight time hourly rate, exclusive of overtime premium for each such holiday.

SECTION 7.   During a week in which a contractually stated holiday falls, time and one-half (1-1/2x) shall be paid for all hours worked in excess of thirty-two (32) hours if on a 5/8 schedule or in excess of thirty (30) hours if on a 4/10. There shall be no pyramiding of overtime and/or holiday pay.

SECTION 8.   Employees who have been assigned such holiday work and then fail to report for and perform such work shall not receive pay for the holiday.

SECTION 9.   In applying this procedure, when any of the above enumerated holidays fall on Sunday and the day following is observed as the holiday by the State or Federal Government, it shall be paid as such holiday.

SECTION 10.   All hours actually worked on said holidays will be paid at two times (2x) the regular hourly rate in addition to the eight hours holiday pay.

SECTION 11.   Up to two (2) employees will be permitted to take Martin Luther King Day as a Personal Holiday in accordance with request and seniority.

SECTION 12.   Employees requesting a personal floating day will not be unreasonably denied upon reasonable notice.  It is understood and agreed that the scheduling of a personal floating day will not interfere with customer service needs.

## ARTICLE XIV
## GARMENTS

SECTION 1.   It is agreed that if the Employer requires that garments be worn as a condition of employment, the Employer will furnish and launder same where necessary.

    (a) Boot Allowance.  Following ratification of this Agreement, the Employer will reimburse one (1) time each contract year during the term of this Agreement, each employee who presents a receipt of purchase, in the amount of $50.00 per year for above the ankle work boots that are oil resistant, non-skid soled.  Safety toe boots are currently optional; however, the Employer reserves the right to determine if safety toe boots will be required in the future.

## ARTICLE XV
## VACATIONS

SECTION 1.   All employees covered by this Agreement who have attained seniority, and who have been in the continuous employ of the Employer for one (1) year shall receive a one (1) week vacation with pay at their regular classification rate based on the scheduled week in force at the time of said

vacation. Employee(s) after two (2) years of continuous employment shall receive a two (2) week vacation with pay at their regular classification rate based on the scheduled week in force at the time of said vacation. After seven (7) years of continuous employment all employees covered by this Agreement shall be eligible to receive a three (3) week vacation with pay. Employees after nineteen (19) years of continuous employment shall be eligible to receive a four (4) week vacation with pay. Employees after twenty-five (25) years of continuous employment shall be eligible to receive a five (5) week vacation with pay. Employees with two (2) or more weeks of vacation will be permitted to take two (2) weeks of vacation one (1) day at a time with mutual agreement. Such approval will not be unreasonably withheld. It is understood and agreed that the schedules of vacations may not be permitted to interfere with the employers business. Employees must work 130 work-days (1,040 hours) to obtain a full vacation entitlement in any given year. Employees working less than this amount will be paid a pro-rata portion of vacation entitlement. Employees off work on a job related injury or illness will continue to earn vacation for up to five (5) months.

SECTION 2. Should the Company so request an employee shall have the option of selling back to the Company any and all vacation entitlements under the terms of this Article in the amounts so requested by the Company. If the Company does not request this selling of vacation entitlements the Company shall be under no obligation to buy any vacation entitlements back from an employee.

## ARTICLE XVI
## CONDUCT OF EMPLOYEES

SECTION 1. The Employer will not discharge or suspend any employee without just cause and shall give at least one (1) warning of the complaint against such employee in writing to the Union and the employee before he is discharged or suspended for a repetition of the same complaint (such notice shall expire after twelve (12) months, except for preventable on-the-job safety related property damage incidents such notice shall expire after twenty-four (24) months. Discharge or suspension must be by proper written notice to the affected employee, with a copy sent to the Union within forty-eight (48) hours. However, with the exception of instances of drug/alcohol intoxication or workplace violence, no employee shall be discharged, suspended or taken from service without being given a hearing by the Employer with the Union Business Agent present at the hearing.

No warning notice or hearing need be given in the case of: dishonesty; workplace violence; possession of weapons while at work; being in possession, using, or under the influence of narcotics or intoxicating beverages while on duty (as determined by drug/alcohol testing or a failure/refusal to test), using any cellular phone, or any hand held or hands free communication device while operating a Company or Commercial Motor Vehicle; failure to immediately report any

accident which has resulted in personal injury or property damage; permitting unauthorized persons to ride in the Employer's vehicles; failure to report the revocation or suspension of a driver's license; willful destruction of the Employer's, customer's, co-workers or public property; theft; becoming involved in a serious motor vehicle accident while driving the Employer's vehicle as a result of negligence or recklessness; fighting; refusing to carry out a direct order of a superior; and, using an employer's vehicle for personal use without permission.

SECTION 2.  Employees, while on Company time, shall present a proper and clean appearance and a courteous attitude to fellow employees, the public, and to the Employer's customers.

SECTION 3.  When any disciplinary action is contemplated by the Company, the employee involved will be notified of said impending action within five (5) working days of the disciplining manager having knowledge of the incident or no disciplinary action will be taken.

## ARTICLE XVII
## HEALTH AND WELFARE

SECTION 1.  Employees covered by this Agreement will be eligible to enroll in a Penske Managed Care Program (the "Program") as modified.  The terms and conditions of the Program shall be revised from time to time and such revisions will automatically be extended to employees covered by this Agreement at the earliest feasible date but not later than six (6) months from the date of such revisions.  During the term of this agreement any increases, or decreases in the amount of the employee contribution currently being made by said employees will be done on a corporate-wide basis.

Full time employees will be eligible to enroll in the Penske Entry Level Benefit Plan, as modified, on the 1st of the month following sixty (60) days of continuous employment.  The terms and conditions of the Penske Entry Level Benefit Plan shall be revised from time to time and any such revisions will automatically be extended to employees covered by this Agreement at the earliest feasible date but no later than six (6) months from the date of such revision.  Full time employees will be eligible to enroll in the Penske Managed Care Program, referenced in Section 1 of this Article, after twenty-four (24) months of employment.

## ARTICLE XVIII
## PENSION FUND

SECTION 1.  Employees covered by this Agreement will be covered by the

Penske Truck Leasing Co., L.P. Hourly Pension Plan incorporated by reference herein. The Company shall have the right to take and effectuate automatically any amendments to the Penske Truck Leasing Co., L.P. Hourly Pension Plan. The Union agrees and consents for on behalf of all employees in the bargaining unit to any and all such amendments during the term of this Agreement. Employees with one (1) or more years of continuous service with the Company are immediately eligible to join the Penske Truck Leasing Co., L.P. Hourly Pension Plan. Any employee must sign up for the Plan in order to be eligible for benefits under the Plan. The normal monthly benefit shall be twenty-one dollars ($21.00) per year of credited service. The Plan will be frozen for benefit purposes effective 3/1/00.

SECTION 2. Effective 3/1/99, employees may voluntarily participate in the Teamsters National 401k Plan on a pre-tax basis. Effective upon ratification of this Agreement the Employer shall provide the following contribution to the 401(k) Plan on behalf of each enrolled employee up to a maximum of forty (40) hours per week:

| Date | Hourly Rate |
|---|---|
| 3/1/19 | $2.30 |
| 3/1/20 | $2.30 |
| 3/1/21 | $2.30 |
| 3/1/22 | $2.30 |

In the case of any full time seniority employees, the provisions of this Article shall not become applicable until after completion of one (1) year of employment.

## ARTICLE XIX
## DEATH IN FAMILY

SECTION 1. In the event of the death of a member of an employee's immediate family and step (parents, foster parents, sister, brother, children, step-mother, step-father, spouse, mother-in law, father-in-law, grandparents or grandchildren) said employee will be granted a leave of absence with pay from the day of death until and including the day of the funeral. In no event will such leave exceed three (3) days. A fourth (4th) day, without pay shall be granted if the travel to the funeral is in excess of two hundred (200) miles one-way.

SECTION 2. Such time off will be granted to employees actively at work or scheduled for same, when the unfortunate incident occurs and when such employees absence due thereto would result in a loss of pay if this clause were not in effect. Employees who are laid off, on vacation, on their days off, off sick, etc., shall not be eligible for benefits hereunder.

## ARTICLE XX
## JURY DUTY

**SECTION 1.** Any employee who has acquired seniority status and is required to serve on a municipal, county, or federal jury shall, when so serving, be paid the difference between the amount paid for such service and the employee's regular straight time hourly rate of pay for each eight (8) hour day served during the employees scheduled work-week, not to exceed one (1) month in any calendar year.

**SECTION 2.** To qualify for the payment, an employee must notify his/her supervisor no later than the first scheduled work shift after receipt of notice for selection of jury duty.

**SECTION 3.** If any employee is subsequently excused from attendance in court or if such jury duty for any day shall otherwise end prior to the close of the employee's regular scheduled work day, the employee shall work the remainder of his/her regular work schedule, allowing a reasonable period to travel to his/her place of work.

**SECTION 4.** In order to be eligible for the differential payments permitted under this Article, the employee must furnish a written statement from the appropriate public authority, showing the date and time served and the amount received.

## ARTICLE XXI
## PERSONAL DAYS

**SECTION 1.** Employees working a 5/8 schedule will be given six (6) personal/sick day's (48 hours) with pay or employees working a 4/10 schedule will be given five (5) personal/sick day's (50 hours) with pay, provided they have at least one (1) year of service. Employees requesting personal/sick days will not be unreasonably denied upon reasonable notice. Reasonable notice for sick days is understood to be at least two (2) hours prior to the start of their shift.

Full time seniority employees with less than one (1) year's seniority will receive three (3) paid personal/sick days upon successfully completing probation and will then grow in at the rate of one (1) additional personal/sick day for each subsequent three (3) months of such employment until reaching the maximum total of six (6) personal/sick days per calendar year if working a 5/8 schedule; employees working a 4/10 schedule will receive a maximum of five (5) personal/sick days per calendar year.

**SECTION 2.** After reaching one (1) year's seniority, employees must work a minimum of 130 days (1,040 hours) in a preceding year to be eligible for a full entitlement to personal/sick days. Employees working less than 130 days will be

provided a pro-rata entitlement.

SECTION 3. Personal/sick days will be awarded from January 1 through December 31 of any given year. All unused personal/sick days will be paid out on a separate check in the first pay period following December 31. To bridge the change to a calendar year personal/sick day renewal, beginning July 1, 2016, employees with at least one (1) years' seniority shall receive three (3) personal/sick days. These three (3) days will expire on December 31, 2016. Employees with less than one (1) years' seniority shall continue to grow into a maximum of three (3) days under the terms of this Article to be used during the period from July1, 2016 expiring December 31, 2016.

## ARTICLE XXII
## NO DISCRIMINATION

SECTION 1. The Employer and the Union agree that neither will discriminate either directly or indirectly, nor will they permit any of their agents, members or representatives to discriminate either directly or indirectly against any employee by reason of race, religion, color, age, sex, veteran's status, being handicapped or membership or activity in the Union.

The use of the masculine gender in this Agreement shall include both male and female.

## ARTICLE XXIII
## TOOL INSURANCE

SECTION 1. The reasonable replacement value of an employee's hand tools and tool box will be replaced or otherwise paid for by the Company due to theft or fire only to the extent and only in accordance with the following conditions, after a two hundred and fifty ($250.00) deductible has been met:

(a) The employee shall present an inventory (updated at least annually) of tools and tool boxes, including size and brand name, which must be kept on Company property. The Service Manager will mark through unapproved tools and return an approved photocopy, signed by the employee and the Service Manager, to the employee of the tools which may be replaced by the Company.

(b) Miscellaneous tools lost or stolen from open boxes shall not be replaced by the Company.

(c) The Company shall not replace tools or boxes which may be missing when the particular employee has not complied with Company

regulations regarding the locking of boxes, or securing of tools in the tool enclosures provided on the Road Service Vehicle. There must be evidence of a forcible entry into Company premises and/or the employee's tool box.

(d) The Company shall not replace tools or tool boxes not itemized on the approved inventory copy provided by the Service Manager.

(e) Employees must report all thefts to the Police Department and cooperate with police and Management regarding itemization, identification, and recovery of stolen items.

(f) All inventoried tools may be removed from Company premises provided the employee obtains approval from the Service Manager.

## ARTICLE XXIV
## SAFETY

SECTION 1. A member of the bargaining unit will be appointed to inform management of safety concerns as they arise. Any such issues which are not satisfactorily addressed by management will be subject to the grievance procedure in Article VI.

## ARTICLE XXV
## TRANSFER OF COMPANY TITLE OR INTEREST

SECTION 1. This Agreement hereinafter referred to collectively as Agreement, shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event an entire operation is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this agreement for the life thereof. It is understood by this Section that the parties hereto shall not use any leasing device to a third party to evade this Agreement. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee. Lessee, assignee, etc., of the operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the Local Union at the time the seller, transferee or lessor executes a contract or transaction as herein described. The Local Union shall also be advised of the exact nature of the transaction, not including financial details.

## ARTICLE XXVI
## MOONLIGHTING

SECTION 1. No employee may perform work for any Company presently in competition with Penske Truck Leasing.


## ARTICLE XXVII
## MISCELLANEOUS

SECTION 1. Commercial Driver's License (CDL): All Technicians shall possess a valid Class A CDL License; and all CSR employees will possess a valid Class B CDL License. In the case of all Employees hired after the ratification of this Agreement such "New Hires" shall obtain and maintain a valid CDL as required in accordance with their Job Classification prior to successfully completing probation.

While a CDL is understood as being required to fully function as an employee, the Employer recognizes circumstances occur where Employees may not be able to achieve or maintain a CDL due to their inability to pass a DOT physical exam. In the event a Tech employee becomes disabled to the extent that he/she can perform his/her normal Tech duties, however, is unable to qualify for a CDL License, then such individuals medical condition will be reviewed by a physician of the Company's choosing. The medical doctor will determine if the individual is, in fact, medically unqualified to possess a CDL License. If such a determination is made, then the Company will comply with the provisions of the American's With Disabilities Act. Any employee so identified as being unable to qualify for a CDL due to an inability to obtain a valid DOT Medical Card or Waiver, as such the Employer may suspend the employee's CDL requirement as the employer and the employee work together towards CDL requalification.


## ARTICLE XXVIII
## SAVINGS AND LEGALITY CLAUSE

SECTION 1. This Agreement is effective the first (1st) day of March 2019 and shall continue in full force and effect without change until February 28, 2023.

SECTION 2. In the event that any part or provision of this Agreement shall be rendered or declared invalid by reason of any law, regulation, order or decree of any court or board, then only that part or provision rendered or declared invalid shall be considered null and void, and the remainder of this Agreement shall remain in full force and effect according to the original terms.

If either party desire to modify or change this Agreement it shall sixty (60) days prior to February 28, 2019 or any subsequent last day of February date, give written notice to such effect. Within ten (10) days after receipt of said notice, a conference will be arranged to negotiate the proposals, in which case this Agreement shall continue in full force and effect until terminated as provided hereinafter.

If notice of intention to modify or change has been given in accordance with the above provisions, this Agreement may be terminated by either party on thirty (30) days written notice of termination given on or after the next following said notice of intention to modify or change.

SECTION 3.    The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.   Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by themselves and or their respective officers and representatives as follows:

PENSKE TRUCK LEASING CO., L.P.

Local 957, Affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA

BY: _____
Byron O. Magafas
Director, Labor Relations

BY: _____
Mark Morell
Business Agent

BY: _____
Chad Powell
District Manager

BY: _____
Darrell Paschal
Vice President

BY: _____
Katie Brown
Area Human Resource Manager

BY: _____
Dan Webb
Secretary Treasurer

BY: _____
Ed Bales
District Service Manager

BY: _____
Alan Weeks
Recording Secretary

BY: _____
Toby Harvey
Branch Manager

BY: _____
Brendan Wiggy
Steward

BY: _____
Darryl Carter
Steward

BY: _____
David Fitz
Steward

# LETTER OF AGREEMENT

April 23, 2007

Mr. Mike Darner
General Truck Drivers, Chauffeurs,
Warehousemen & Helpers, Local Union No. 987
Affiliated with the International Brotherhood of
Teamsters, AFL-CIO
2719 Armstrong Lane
Dayton, Ohio 45414

Dear Mr. Darner:

This Letter of Agreement is to memorialize the understanding which was reached on Friday, April 20, 2007 while Representative of Teamster Local No. 957 ("Union") and Penske Truck Leasing Co., L.P. ("Penske") were engaged in bargaining the new Collective Bargaining Agreement to which this Letter of Agreement will be attached. That Agreement is as follows:

1. The Apprentice Program to which the Union and the Company had been subject will be void and of no further force or effect.

2. The new method for training and promoting associates within the PTL-Dayton Facility will be as follows:

   a. It is the intention of Penske Truck Leasing to utilize the skills and talents of employees in the bargaining unit. Consistent with this intent is the policy of Penske to promote qualified internal candidates where appropriate. All permanent vacancies will be posted in accordance with the terms and conditions of this Collective Bargaining Agreement. Individuals in lower classifications will be deemed eligible bidders, provided they are qualified to perform the duties and have completed the appropriate Company training/certification requirements are outlined in Exhibit A attached to this Letter of Agreement.

b. Qualification for promotion will be determined by Penske on the basis of an evaluation of work performed in the previous calendar year, including performance on job assignments. Attached to this Letter of Agreement is an outline of the Penske Tech Certification Program which, along with daily performance, will be utilized to evaluate a candidate's ability, efficiency, knowledge, skill and training when considering applicants for a promotion. The parties hereto recognize that this is a pilot program. The program may be modified or changed with the mutual agreement of the Union. The Program may be cancelled by Penske at its sole option.

c. Employees will be offered an opportunity annually during their performance review to discuss their promotional opportunities with their immediate supervisor or District Service Manager. A report of such meeting will be included in their file. Work related performance issues, such as work performance, discipline and a willingness to attend training when offered, will also be considered in offering promotional opportunities. If all qualified individuals for a particular opening are of equal ability, then the position will be offered in accordance with seniority.

d. Technician training/certification will be available to all employees. Completion of the certification does not guarantee a promotion; however, it does prepare the employee in the event an opening should subsequently occur. Promotions will occur when Penske, in its sole discretion, determines an additional person is needed in a particular classification.

e. Existing Tech I's and/or CSR's will not be required to re-qualify for the position they currently occupy.

The parties hereto have signed this letter to formalize that Agreement.

**Penske Truck Leasing Co., L.P.**          **Teamsters Local Union No. 957**

By:_____          By:_____
  William W. Allport, Esq.             Mike Darner
  Vice President, Labor Relations      Business Agent


Date:_____          Date:_____

# LETTER OF UNDERSTANDING

March 5, 2012

To the extent that a customer account assigned to Penske Truck Leasing Co., LP, ("Penske") at Dayton, Ohio, is serviced at or by employees represented by Teamsters Local Union No. 957, ("Local 957") the Collective Bargaining Agreement between Penske and Local 957 will apply in its entirety unless otherwise modified below.

Specific to any new Penske facility opened to service an account that was assigned to Penske at Dayton, Ohio, such new facility would remain on the Dayton master Seniority List for purposes of layoff, recall and job openings; however, shift, vacation and overtime considerations shall be addressed at the location level.


**Penske Truck Leasing Co., L.P.**                    **Teamsters Local Union No. 957**



By:_____          By:_____
    David S. Lerew                          Mike Darner
    Director, Labor Relations                Business Agent



Date:_____          Date:_____

## LETTER OF UNDERSTANDING

March 1, 2019

It is agreed that the following understandings shall apply to associates working an alternative schedule featuring three (3) twelve (12) hour shifts.

1) Associates working the 3/12 shift shall be paid the equivalent of forty (40) hours per week.
2) Associates working the 3/12 shift shall be entitled to four (4) Personal Days under Article 22, Section 1.
3) A week of vacation under Article 15, Section 1, shall consist of three (3) days for associates working the 3/12 shift.
4) The company shall make all reasonable efforts to assure at least a Saturday or Sunday off for the 3/12 schedule, provided the needs of the business can be met.
5) Overtime shall be paid after forty (40) hours actually worked.

**Penske Truck Leasing Co., L.P.**                **Teamsters Local Union No. 957**

By:_____                By:_____
   Byron O. Magafas                                    Mark Morell
   Director, Labor Relations                        Business Agent

Date:_____                Date:_____

## LETTER OF UNDERSTANDING

March 1, 2019

In the event the Company utilizes a 3/12 schedule, it is agreed that the workdays shall consist of three (3) consecutive days.

**Penske Truck Leasing Co., L.P.**         **Teamsters Local Union No. 957**

By:_____         By:_____
    Byron O. Magafas                          Mark Morell
    Director, Labor Relations             Business Agent

Date:_____         Date:_____



**GRIEVANCE FORM**

**TEAMSTERS**

**LOCAL UNION NO. 957**
2719 ARMSTRONG LANE
DAYTON, OHIO 45414

**EXHIBIT**

B

| CASE NO. | CITY | S |
|---|---|---|

| NATIONAL MASTER FREIGHT | |
|---|---|
| ARTICLE | SECTION |
| ROAD | CITY |

**NAME** _____

**ADDRESS** _____

**PHONE NO.** _____

**EMPLOYED BY** Penske

**STEWARD** _____

**DISPOSITION**

_(signature)_

5/6/2021

**DATE**   5-6-2021

**DATE HIRED**

Date I saw my employer on this grievance ........................

If this grievance involves money please write amount here ($......................)

**Instructions to Employees:**

1. When the grievance has been written, a copy should be given to the Steward. The original should be given to the foreman (or supervisor).

2. Grievances should be set forth fully so that they may be understood.

3. By presenting the grievance, the employee grants to the Union complete authority to present, negotiate and bargain regarding this grievance and agrees to be bound by such disposition of the grievance as may be made or agreed to by the Union or its delegated representatives. The undersigned employee may be present at any and all steps of the grievance procedure.

**GRIEVANCE: (give dates)**

The Company is in violation of Article 1, section 1 and any other Articles

that may apply. The Union beleives the Company is in violation of the Letter of

Understanding signed on 3-5-2012 on page 29 of the CBA.

_(signature)_   Darryl _____

**Employee's Signature**

**DISPOSITION OF GRIEVANCE**

RECEIVED

MAY 05 2021

TEAMSTERS LOCAL 957

_Grev 3 denied 6/7/2021_

WHITE COPY TO BUSINESS AGENT
YELLOW COPY TO LOCAL 957 OFFICE
PINK COPY TO EMPLOYER
GOLD COPY TO EMPLOYEE

**Business Representative**





EXHIBIT

tabbies®

C

5.10.21
Grievance No 18822
Step 2 Response

The above captioned Grievance was received on May 6, 2021.

The Employer understands this grievance is a matter of contract interpretation, and as such, the burden of proving the alleged contract violation(s) rest with the Grievant. However, no supporting documentation has been submitted with this grievance. Therefore it is the Employer's position that the Grievant has failed to present any evidence to sustain the breach of contract alleged and absent such proof, the Employer has no alternative but to sustain its decision as being in accordance with the correct administration of the Labor Agreement.

Further and without waiving the defense stated above, the Employer states that this grievance is untimely and therefore is denied and barred from any further processing.

Lastly, as you know, the Union has a duty to furnish information relevant to an ongoing grievance. NLRA Section 8(b)(3) and *UNITE HERE Local 1*, 369 NLRB No. 65 (April 30, 2020). In the event the Union <u>does not</u> withdraw this grievance, please accept this correspondence as a formal Request for Information and forward all such information within **five business days**. The Employer is requesting:

- Specific relief requested by the Union/Grievant.
- Any and all evidence the Union/Grievant relies upon to support its contract violation claim(s)
- Identification of the individual who are in possession of evidence the Union/Grievant relies upon to support its contract violation claim(s)
- Date the Grievant/Union became aware of the contact violation(s) alleged
- How the Grievant/Union became aware of the contact violation(s) alleged

Respectfully,

Ian Taylor
District Manager

**Mark Morell**

EXHIBIT

D

| | |
|---|---|
| **From:** | Mark Morell |
| **Sent:** | Tuesday, June 15, 2021 3:34 PM |
| **To:** | Taylor, Ian (Penske) |
| **Subject:** | Unions Response to Company  Response Dated 6/7/2021, Grievance No. 18822, Step 3 Grievance Hearing |

June 15, 2021.

Ian,

It is still the position of Teamsters Local 957, that Grievance No. 18822, has merit. We believe that Article 1. Recognition, and the Letter of Understanding dated March 5, 2012, page 29, of the CBA,
Is our position that Penske Piqua, should be a part of the Bargaining Unit, of the Penske of Dayton, Ohio facility.

Since we can't resolve the issue at present, Teamsters Local 957, will move forward to Arbitration.


 Respectfully,



Mark Morell, Business Representative
Teamsters Local 957
2719 Armstrong Lane
Dayton, OH 45414
Ph: 937-278-5781 Ext 125
Fx: 957-278-7577



**EXHIBIT**

tabbies

E

_____

FMCS Form R-43                    FEDERAL MEDIATION AND CONCILIATION SERVICE
                                              WASHINGTON, DC  20427
                                        **REQUEST FOR ARBITRATION PANEL**

| **Internet Version** | **Tracking #:** | **Case #:** 210615-07652 | **Date:** 06/15/2021 |
|---|---|---|---|

**1.  EMPLOYER**
Company Name:     Penske Truck Leasing

Representative Name: (Last)    TAYLOR          (First)   IAN                    (Initial)

Street:    2528 COMMODITY CIRCLE

City:    CINCINNATI            State:    Ohio        Zip Code:    45241

Phone:    (513)771-7706              Fax:

Email:    ian.taylor@penske.com

**2.  UNION**
Union Name:    Teamsters                              Local #:    957

Representative Name: (Last)    Morell          (First)   Mark                (Initial)

Street:    PO Box 13357

City:    Dayton                State:    Ohio        Zip Code:    45413

Phone:    (937)278-5781              Fax:

Email:    mmorell@teamsterslocal957.com

3.  Site of Dispute: City:    DAYTON        State:    Ohio    **Zip Code: *    45414**
                                                    *Required for Metropolitan Selection

4.  Select the panel of arbitrators from below or see "Special Requirements" on page 2.
     ☐Regional        ☒Sub-Regional        ☐Metropolitan    (May cross state boundaries.)

5.  **Type of Issue:**    OPENED A NEW LOCATION IN MIAMI COUNTY WHICH THE UNION CONTENDS SHOULD ALSO BE UNION

6.  **Panel Size**    7        A panel of (7) names is usually provided.  If this is a unilateral request, you must attach your relevant contract language  which specifies
                                        a different number  or "certify" on Page 2  that both parties have agreed to the number specified

7.  **Type of Industry:**    ☒Private Sector        ☐State or Local Government            ☐Federal Government

**8.  Payment Options: $70.00 per panel                OR            $35.00 IF FILED AT arbitration.fmcs.gov**
☐    Check/Money Order    Name on Account:            Type:    Personal Checking    ☐    Business Checking    ☐
(SEE DISCLOSURE STATEMENT ON PAGE TWO IF PAYMENT IS BY CHECK.)                Personal Savings    ☐
☐    ABA Routing Number:                Checking Acct.#:
☐    Check to split payment evenly                Pay.Gov Tracking#:
☐VISA        ☐MASTERCARD        ☐AMERICAN EXPRESS        ☐DISCOVER        ☐PREPAID ACCOUNT
Name(1):    ***********        Paid by:    ☐Union    ☐Employer    Amount:    $35.00
Card Number:    ****                Expires:    Month:    *        Year:    ****
☐VISA        ☐MASTERCARD        ☐AMERICAN EXPRESS        ☐DISCOVER        ☐PREPAID ACCOUNT
Name(2):            Paid by:    ☐Union    ☐Employer    Amount:
Card Number:                Expires:    Month:        Year:
ALC for Federal Agencies:    ALC #:            Prepayment #:

**9.  Signatures:**    Employer:        Union: Mark Morell ((937)278-5781) 6/15/2021

**PAPERWORK REDUCTION ACT NOTICE:**  The estimated burden associated with this collection of information is 10 minutes per respondent.  Comments concerning
the accuracy of this burden estimate and suggestions for reducing this burden should be sent to the Office of General Counsel, Federal Mediation and Conciliation Service,
2100 K Street, NW, Washington, DC 20427 or the Paperwork Reduction Project 3076-0002, Office of Management and Budget, Washington, DC 20503.



FMCS Form R-43

FEDERAL MEDIATION AND CONCILIATION SERVICE
WASHINGTON, DC 20427
**REQUEST FOR ARBITRATION PANEL**

Internet Version          Tracking #:          **Case #:**      210727-08758          **Date:**      07/27/2021

---

**1. EMPLOYER**
Company Name:      <u>PENSKE TRUCK LEASING</u>

Representative Name: (Last)      <u>Magafas</u>          (First)      <u>Byron</u>          (Initial)

Street:      <u>14528 S Outer 40 Rd, Suite 424</u>

City:      <u>CHESTRERFIELD</u>          State:      <u>Missouri</u>          Zip Code:      <u>63017</u>

Phone:      <u>(636)735-4389</u>          Fax:

Email:      <u>byron.magafas@penske.com</u>

---

**2. UNION**
Union Name:      <u>International Brotherhood of Teamsters</u>          Local #:      <u>957</u>

Representative Name: (Last)      <u>SMITH</u>          (First)      <u>BOB</u>          (Initial)

Street:      <u>PO Box 13357</u>

City:      <u>Dayton</u>          State:      <u>Ohio</u>          Zip Code:      <u>45413</u>

Phone:      <u>(937)278-5781</u>          Fax:

Email:      <u>BSMITH@TEAMSTERSLOCAL957.COM</u>

---

3. Site of Dispute: City:      <u>Dayton</u>          **State:**      <u>Ohio</u>          **Zip Code: ***      <u>45414</u>
                                                                    *Required for Metropolitan Selection

4. Select the panel of arbitrators from below or see "Special Requirements" on page 2.
   ☒Regional          ☐Sub-Regional          ☐Metropolitan      (May cross state boundaries.)

5. Type of Issue:      unit jurisdiction

6. **Panel Size**      7          A panel of (7) names is usually provided.  If this is a unilateral request, you must attach your relevant contract language  which specifies
                                 a different number  or "certify" on Page 2  that both parties have agreed to the number specified

7. Type of Industry:      ☒Private Sector          ☐State or Local Government          ☐Federal Government

---

**8. Payment Options:** $70.00 per panel          **OR**          $35.00 **IF FILED AT arbitration.fmcs.gov**
☐  Check/Money Order      Name on Account:          Type:   Personal Checking      ☐  Business Checking      ☐
**(SEE DISCLOSURE STATEMENT ON PAGE TWO IF PAYMENT IS BY CHECK.)**          Personal Savings      ☐
☐  ABA Routing Number:          Checking Acct.#:
☐  Check to split payment evenly          Pay.Gov Tracking#:
☐VISA          ☐MASTERCARD      ☐AMERICAN EXPRESS          ☐DISCOVER          ☐PREPAID ACCOUNT
Name(1):      *************          Paid by:   ☐Union      ☐Employer      Amount:      $35.00
Card Number:      ****          Expires:   Month:      *          Year:      ****
☐VISA          ☐MASTERCARD      ☐AMERICAN EXPRESS          ☐DISCOVER          ☐PREPAID ACCOUNT
Name(2):          Paid by:   ☐Union      ☐Employer      Amount:
Card Number:          Expires:   Month:          Year:
ALC for Federal Agencies:      ALC #:          Prepayment #:

---

9. Signatures:      Employer: Byron Magafas ((636)735-4389) 7/27/2021          Union:

---

**PAPERWORK REDUCTION ACT NOTICE:**  The estimated burden associated with this collection of information is 10 minutes per respondent.  Comments concerning
the accuracy of this burden estimate and suggestions for reducing this burden should be sent to the Office of General Counsel, Federal Mediation and Conciliation Service,
2100 K Street, NW, Washington, DC 20427 or the Paperwork Reduction Project 3076-0002, Office of Management and Budget, Washington, DC 20503.

**EXHIBIT**

| FORM NLRB-502 (UC)<br>(2-18) | UNITED STATES OF AMERICA<br>NATIONAL LABOR RELATIONS BOARD<br>**UC PETITION** | DO NOT WRITE IN THIS<br>Case No.<br>09-UC-281192 | G |
|---|---|---|---|

**INSTRUCTIONS:** *Unless e-Filed using the Agency's website, www.nlrb.gov/, submit an original of this Petition to an NLRB office in the Re_ employer concerned is located.*

**1. PURPOSE OF THIS PETITION**: UC - UNIT CLARIFICATION - A labor organization is currently recognized by the Employer, but the Petitioner seeks clarification of the placement of certain employees or job classifications. **The Petitioner alleges that the following circumstances exist and requests that the National Labor Relations Board proceed under its proper authority pursuant to Section 9 of the National Labor Relations Act.**

| 2a. Name of Employer<br>Penske Truck Leasing Co, LP | 2b. Address(es) of Establishment(s) involved *(Street and number, city, state, ZIP code)*<br>2528 Commodity Circle, Cincinnati Ohio 45241 |
|---|---|

| 3a. Employer Representative - Name and Title<br>Ms. Cassandra Booms, Labor Relations Manager;<br>Byron Magafas, Director, Labor Relations | 3b. Address *(If same as 2b - state same)*<br>15041Commerce Drive S, Suite 400 Dearborn, MI 48120; and 14528 S Outer 40<br>Rd. Ste 424, Chesterfield, MO 63017 |
|---|---|
| 3c. Tel. No. 734-626-2666; and<br>636-735-4389 | 3d. Cell No.<br>636-484-4367 | 3e. Fax No. | 3f. E-Mail Address  cassandra.booms@penske.com; and<br>byron.magafas@penske.com |

| 4a. Type of Establishment *(Factory, mine, wholesaler, etc.)*<br>Truck, garages, and rental lots | 4b. Principal product or service<br>truck leasing, maintenance and repair |
|---|---|

| 5a. Description of *Present* Unit<br>**Included:**<br>See Exhibit A<br><br>**Excluded:**<br>See Exhibit A | 5b. No. of Employees<br>in Present Unit:<br><br>22 |
|---|---|

| 6a. Description of *Proposed* Unit<br>**Included:**<br>See Exhibit B<br><br>**Excluded:**<br>See Exhibit B | 6b. No. of Employees<br>in Proposed Unit:<br><br>22 |
|---|---|

| 7. City and State where unit is located<br>Dayton, Ohio | 8. Check One: ☒ Unit previously certified in Case   9-RC-4699<br>☐ Unit not previously certified |
|---|---|

**9. Job classifications of employees as to whom the issue is raised and number of employees in each classification**
See Exhibit B - 2 employees

**10. Reason Why Petitioner Desires Clarification**
See Exhibit C

| 11a. Name of Recognized or Certified Bargaining Agent<br>International Brotherhood of Teamsters, Local Union # 957 | 11b. Address<br>2719 Armstrong Lane, Dayton, Ohio 45414 |
|---|---|
| 11c. Tel. No.<br>937-278-5781 ext. 125 | 11d. Cell No. | 11e. Fax No.<br>957-278-7577 | 11f. E-Mail Address<br>mmorell@teamsterslocal957.com |
| 11g. Affiliation, if any<br>IBT | 11h. Date of Recognition or Certification<br>unknown | 11i. Expiration Date of Current or Most Recent Contract, if any *(Month, Day, Year)*<br>February 28, 2023 |

**12. Organizations or persons other than Petitioner and those named in item 11, who claim to represent any employees affected by the proposed clarifications.** *(If none, so state)*
None

| 12a. Name<br>N/A | 12b. Address<br>N/A | 12c. Tel. No.<br>N/A | 12d. Cell No.<br>N/A |
|---|---|---|---|
| | | 12e. Fax No.<br>N/A | 12f. E-Mail Address<br>N/A |

| 12g. Brief Description of Contract Covering those Employees<br>N/A | | | |

| 13a. Full Name of Petitioner *(including local name and number if applicable)*<br>Penske Truck Leasing Co, LP | 13b. Address *(Street and number, city, state, ZIP code)*<br>See 2b above |
|---|---|

| 13c. Full name of national or international labor organization of which Petitioner is an affiliate or constituent *(if none, so state)*<br>N/A | | | |

| 13d. Tel. No.<br>N/A | 13e. Cell No.<br>N/A | 13f. Fax No.<br>N/A | 13g. E-Mail Address<br>N/A |
|---|---|---|---|

**14. Representative of the Petitioner who will accept service of all papers for purposes of the representation proceeding.**

| 14a. Name and Title<br>Art Carter | 14b. Address *(Street and number, city, state, ZIP code)*<br>2001 Ross Avenue, Suite 1500, Dallas, TX 75201 |
|---|---|
| 14c. Tel. No.<br>214-880-8100 | 14d. Cell No.<br>214-709-2816 | 14e. Fax No.<br>214-594-8601 | 14f. E-Mail Address<br>atcarter@littler.com |

**I declare that I have read the above petition and that the statements are true to the best of my knowledge and belief.**

| Name (Print)<br>Art Carter | Signature | Title<br>Shareholder | Date<br>8/11/21 |
|---|---|---|---|

**WILLFUL FALSE STATEMENTS ON THIS PETITION CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

PENSKE TRUCK LEASING CO., LP          - 3 -                    August 12, 2021
Case 09-UC-281192

     We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

     Very truly yours,

Matthew T. Denholm
Regional Director

Enclosures

   1.    Copy of Petition
   2.    Description of Procedures in Unit Clarification Cases (Form NLRB-5548)